IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| DORIS RICKS-LANKFORD | § | |
| | § | |
| V. | § | A-10-CA-011 SS |
| | § | |
| TEXAS DEP'T OF ASSISTIVE AND | § | |
| REHABILITATIVE SERVS., et al | § | |

## REPORT AND RECOMMENDATION
## OF THE UNITED STATES MAGISTRATE JUDGE

TO: THE HONORABLE SAM SPARKS
      UNITED STATES DISTRICT COURT

Before the Court is Defendants' Motion for Summary Judgment (Clerk's Doc. No. 51); Plaintiff's Response to Defendants' Motion for Summary Judgment (Clerk's Doc. No. 56); and Defendants' Reply to Plaintiff's Response to Defendants' Motion for Summary Judgment (Clerk's Doc. No. 59). On October 4, 2011, The District Court referred these motions to the undersigned Magistrate Judge for report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(A), Federal Rule of Civil Procedure 72, and Rule 1(c) of Appendix C of the Local Rules of the United States District Court for the Western District of Texas, Local Rules for the Assignment of Duties to United States Magistrate Judges (Clerk's Doc. No. 57).

Plaintiff Doris Ricks-Lankford filed suit against the Texas Department of Assistive and Rehabilitative Services (DARS) and Debra Wanser, the Commissioner of DARS, in her official capacity. She contends that she was fired by the Defendants in violation of the Rehabilitation Act (RA), the Age Discrimination in Employment Act (ADEA), and the Americans with Disabilities Act (ADA). The Defendants have filed a motion for summary judgment, claiming that the Plaintiff failed to demonstrate that she was qualified for her position, that the Defendants refused to

accommodate her disability, or that the Defendants fired her because of discrimination or retaliation. The Defendants also assert that the Plaintiff did not identify an employee that the Defendants treated differently. After reviewing the parties' briefs, relevant case law, as well as the entire case file, the Court submits the following Report and Recommendation.

**I.     Summary Judgment Standard**

Summary judgment shall be rendered when the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine dispute as to any material fact and that the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986); *Washburn v. Harvey*, 504 F.3d 505, 508 (5th Cir. 2007). A dispute regarding a material fact is "genuine" if the evidence is such that a reasonable jury could return a verdict in favor of the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). When ruling on a motion for summary judgment, the court is required to view all inferences drawn from the factual record in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 587 (1986); *Washburn*, 504 F.3d at 508. Further, a court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000); *Anderson*, 477 U.S. at 254–55.

**II.    Factual Background**

The Plaintiff began her employment with DARS in December 2008, and DARS fired her in June 2009. She never advanced out of her six-month probationary period. The Plaintiff contends her firing was discriminatory and retaliatory, and that the Defendants failed and refused to

accommodate her disability. The Defendants deny this, and assert that they fired her because of her poor performance.

The Plaintiff began working for DARS in its Blind Services Division (DBS)[1] as a vocational rehabilitation counselor (VRC) on December 12, 2008. All newly hired employees are treated as probationary for six months, and DARS policy provides that a probationary employee may be terminated "solely on a determination that the employee is not suited to the position." Defendants' Exh. B4 at p. DARS-001949. Before working for DARS, the Plaintiff was a DARS client (due to her osteoarthritis). Soon after commencing her job, the Plaintiff requested several accommodations. Because her osteoarthritis affected her hands, she asked for a touch pad and a soft touch keyboard to mitigate the pain caused by typing. Deposition of Doris Ricks-Lankford at 51. She also requested a headset and recorder, both of which she received. *Id.* at 63.[2]

One May 21, 2009, the Plaintiff contacted her own vocational rehabilitation counselor and requested a "way to take notes by recording rather than writing," a bigger computer, and training in Microsoft Office. Defendants' Exhibit E. In response, the DARS representative explained to the Plaintiff that DBS, not DARS, provided accommodations to DBS employees, but also told the Plaintiff that she could contact the United Cerebral Palsy Association to view transcription software, mouse pads, and other devices to assist her. The Defendants contend that this was the first time that

---

[1]Though it is not entirely clear why, all parties refer to this division as the "DBS," and the Court therefore uses the same acronym in this R&R.

[2]The Defendants did not have a touch pad in stock, so they provided the Plaintiff with links to touch pads online and let her choose one. Ricks-Langford Depo. at 51; Declaration of Rolinda Duran ¶ 5. After the Plaintiff chose one, the Defendants ordered it for her and configured her laptop to help her until it arrived. Deposition of Ricks-Lankford at 57. Although the initial touch pad was too small, the Defendants continued to search for and acquire a suitable replacement. *Id.* at 51.

3

the Plaintiff requested assistance in Microsoft Office (something her resume claimed she was skilled in, Defendants' Exh. C2 at DARS-001921; Plaintiff's Exh. E at DARS-001704), and also the first time she asked for transcription technology. Regardless, her supervisor instructed the Plaintiff to inquire of UCP about software and other assistive technology. Defendants' Exh. C2 at DARS-1921. Several days later, the Plaintiff advised her supervisor that she would be meeting with a person at UCP regarding transcription software called Dragon Naturally Speaking. *Id.* That visit took place on June 2, 1999.

Two days later, on June 4, 2009, the Plaintiff was fired. The Defendants state that they fired the Plaintiff for poor performance, and deny that they retaliated or discriminated against the Plaintiff. The Defendants contend that throughout her probationary period, the Plaintiff's supervisors expressed concern that she could not maintain a full caseload of consumers. Irene Resendes, a VRC supervisor at DBS, met with the Plaintiff on eight occasions to discuss her weaknesses and how to improve her performance. Affidavit of Resendes ¶ 7. Resendes focused on the Plaintiff's pace: in Resendes' view, the Plaintiff spent too much time writing information already in the file instead of focusing on assisting their clients to find jobs. *Id.* ¶ 10.[3] Resendes counseled the Plaintiff that because she did not limit her interactions with clients to career counseling and case management, she spent too much time per consumer, which in turn prevented her from maintaining a full case load. *Id.*

---

[3]As part of her supervision of the Plaintiff, Resendes kept extensive developmental notes. Affidavit of Resendes ¶ 4–5. These notes chronicle a series of discussions with the Plaintiff on issues encompassing accommodation requests, problems with her work load, and interactions with colleagues and consumers. *Id.* ¶ 5–6. In addition to noting her persistent problems with handling her case load, the notes also detailed several incidents where the Plaintiff had difficulty communicating with her colleagues and consumers. Defendants' Exh. C2 at DARS- 001917–1920.

The Plaintiff disagrees that she was fired for poor performance. Although she does not dispute that she wrote long notes or that she failed to keep up with her caseload, she claims that "these subjective criticisms of performance style" fail to demonstrate that she was "categorically incapable of performing or even understanding her job." Plaintiff's Response ¶ 10. The Plaintiff states that if her performance fell short, the cause was the Defendants' reticence to provide training. Thus, the Plaintiff contends that the real reason for her termination was age and disability discrimination as well as retaliation.

## III. Analysis

### A. ADA and Rehabilitation Act Claims

The Rehabilitation Act states that "[n]o otherwise qualified individual with a disability . . . shall solely by reason of his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance. . . ." 29 U.S.C. § 794(a). The ADA states that "[t]he remedies, procedures and rights" available under the Rehabilitation Act are also accessible under the ADA. *Delano-Pyle v. Victoria County, Tex.*, 302 F.3d 567, 574 (5th Cir. 2002) (quoting 42 U.S.C. § 12133). The Fifth Circuit has recognized that "[j]urisprudence interpreting either section is applicable to both." *See id.* (quoting *Hainze v. Richards*, 207 F.3d 795, 799 (5th Cir. 2000)). The Court will therefore consider these claims together. To prevail on an ADA claim, the plaintiff must prove that an adverse employment decision was made "solely because of his disability." *Gonzales v. City of New Braunfels*, 176 F.3d 834, 836 (5th Cir. 1999).

**1.     Can the Plaintiff establish a prima facie case?**

In ADA cases in which the plaintiff relies solely on circumstantial evidence, a prima facie case requires evidence that: (1) at the time of the employment action, the plaintiff had a "disability;" (2) she was qualified for the position for which she sought employment or continued employment; (3) she suffered an adverse employment action because of her disability status; and (4) she was replaced by or treated less favorably than non-disabled employees. *Rodriguez v. Conagra Grocery Prods. Co.*, 436 F.3d 468, 474 (5th Cir. 2006). If the Plaintiff establishes a prima facie case, then the burden shifts to the Defendants to provide a legitimate, non-discriminatory reason for their action. *DeCorte v. Jordan*, 497 F.3d 433, 437 (5th Cir. 2007). If the Defendants provide a non-discriminatory reason, then the burden reverts back to the Plaintiff to show that the employer's justification is merely pretext for discrimination. *Id.*

In this case, the Defendants challenge two prongs of the Plaintiff's prima facie case: (1) whether the Plaintiff was qualified for her position; and (2) whether she was replaced by or treated less favorably than a non-disabled employee.

**a.     Plaintiff's qualifications for the VRC I position**

To be a "qualified" individual with a disability, the Plaintiff must be "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The relevant regulation further defines a "qualified individual with a disability" as "an individual with a disability who satisfies the requisite skill, experience, education and other job-related requirements of the employment position and . . . can perform the essential functions of such position." 29 C.F.R. § 1630.2(m). The Defendants claim that the Plaintiff was not qualified for the vocational

rehabilitation counselor position, and that she cannot therefore establish a prima facie case of discrimination. In support of this claim they state that the "essential job duties" of the position require a VCR I to "assist all blind and visually-impaired Texans **within her case load** prepare for, get and retain gainful employment," and because the Plaintiff was unable to maintain a full caseload, she was not qualified for the position. Defendants' Reply at 1 (emphasis in original).

This argument conflates whether the Plaintiff was qualified for her position with the question of whether she was performing her duties properly or well. The undersigned recently rejected the same argument in another case. *See Aquart v. Ascension Health Info. Servcs.*, 2011 WL 233587 (W.D. Tex. Jan. 24, 2011). As explained in *Aquart*, the question of whether a plaintiff actually performed all of the duties of their position is a separate question from whether a plaintiff, with reasonable accommodations, is capable of performing her job. The Defendants do not claim that the Plaintiff's disability, with or without accommodations, prevented her from performing the job's essential duties. Nor do they claim that she lacked the education or requisite skills required for the job. This is what they would have to show to demonstrate that the Plaintiff lacked the qualifications needed for the VCR I position. Instead, they argue that because the Plaintiff did not in fact perform her job, she must lack the qualifications for it. As noted, this confuses the issue. Whether or not a plaintiff actually performed adequately is not properly addressed at the prima facie stage of the analysis. As explained in *Aquart*,

> If poor performance were enough to demonstrate an employee was not "qualified" under the ADA, then the McDonnell-Douglas burden-shifting analysis would be superfluous, as a court would never need to reach the question of whether the performance deficiencies were the reason for termination, since the performance problems would render the plaintiff "unqualified."

*Id.* at *9. Accordingly, this argument fails.

### b. Was the Plaintiff replaced by, or treated less favorably than, a similarly situated non-disabled employee?

The Defendants also contend that the Plaintiff failed to identify a comparable able-bodied employee that either replaced her or was treated more favorably than her. In this case, the Plaintiff faces two obstacles: (1) all of the employees she identifies for comparison had more experience than she did; and (2) they all are disabled. Indeed, the Plaintiff's brief accents the comparators' differences instead of their similarities. She acknowledges that Sherry Taylor was a VRC III, not a VRC I, and worked for DARS for 35 years; Clarissa Curtis and Fran Osborn were also VRC IIIs and each worked for DARS for more than 10 years; and Freddie Powell, the only other probationary employee, had previously worked at DARS for three years. Plaintiff's Response ¶ 20. Powell, the only probationary employee in the group, is the only one who could be considered similarly situated. But importantly, the Plaintiff fails to produce any evidence that Powell (or the others) were woefully behind—as the Plaintiff was—with their caseload. Thus, she has not identified any employee similarly situated to her that was treated differently than she was treated.

As for the fact that all of the comparators she identifies are disabled, the Plaintiff argues that, though disabled, none of them suffered from her disability—osteoarthritis. This misses the mark, because the ADA does not protect subclasses of disabilities. Further, she claims that the Defendants "identified and assessed" these individuals' disabilities and they were not "required to persistently seek accommodations because their conditions had been evaluated, assessed and accommodated." *Id.* ¶ 21. In a rather stunningly confused sentence, the Plaintiff summarizes her argument thusly:

> Knowledge is key to knowing; comparators recommended evaluation of employee needs to accommodate for their disabilities while ignoring this need for rights of Plaintiff Plaintiff's rights as an employee.

Response (Clerk's Doc. No. 56) at ¶ 22. The Court is not really sure what this is supposed to mean, but it appears that the Plaintiff is contending that the Defendants inquired into and accommodated other employees' disabilities, while, in contrast, they failed to inquire into the Plaintiff's disability and therefore could not accommodate her. Assuming this is her argument, it is not factually supported—the undisputed evidence demonstrates that the Defendants met every accommodation request the Plaintiff brought to their attention. More to the point, the argument is illogical. If Defendants were discriminating against people who had disabilities and were requesting accommodations, then why would they have employed and accommodated these other disabled individuals? The fact that they did so undermines the Plaintiff's argument, and suggests that the reason the Plaintiff was treated differently (*i.e.* terminated) is because of her job performance, not her disability or her requests for accommodation.

As noted at the outset, to make a proper prima facie case under either the ADA or the Rehabilitation Act, the Plaintiff must compare herself to a similarly situated non-disabled employee, and show that she was treated less favorably than that employee. She has completely failed to identify such an employee, and for this reason her prima facie case is lacking.

2.    **Rebutting the proffered reasons for termination**

Even if the Plaintiff could make out a prima facie case, she still has to overcome the hurdle of rebutting the Defendants' evidence that they terminated the Plaintiff due to her poor work performance, not her disability. To support this claim, the Defendants offer Resendes's extensive developmental notes on the Plaintiff. These notes demonstrate a several month pattern of the

9

Plaintiff's supervisors coaching her and attempting to prepare her to manage a full caseload.[4] Even after multiple coaching sections, she was "still including a lot of information that is available elsewhere in the electronic case file/folder." Defendants' C2 at DARS-001916.

The Plaintiff's response is at least two-fold. First, in her response, the Plaintiff notes that her firing came before the Defendants received a "report they had commissioned from United Cerebral Palsy of North Texas to assess her need for accommodation through rehabilitative technology." Response at 1. She views this as a "pivotal" fact and as proof of intentional discrimination. The quoted language, however, misstates the evidence. There is no evidence that the letter from UCP was a "report," or that it had been "commissioned" by Defendants. Rather, as noted earlier, the Plaintiff had inquired of her own counselor about voice recognition software, and was told she needed to address that request to her own supervisor. That same day, the Plaintiff's supervisor instructed the Plaintiff to check with UCP to see what was possible and report back to her. There is no evidence that the Defendants expected any written report from UCP regarding the Plaintiff's visit to their assistive technology lab, or that they acted to terminate her before receipt of a report from UCP. The Plaintiff's focus on this letter is misguided. For all the Defendants knew, the UCP had not recommended any assistive technology for the Plaintiff, and the fact that the firing took place before they became aware of the UCP's assessment proves nothing.

---

[4]*E.g.* Defendants' Exh. C2 at DARS-001914 ("Doris has been on the job for 3 months and is still not providing coverage for more than a handful of active cases as compared with other new VRCs who would already be working the bulk of their caseload."); 001915 ("Jean suggests that no other cases be given to Doris at this time. Jean noticed that Doris is easily distracted; 'more time you spend documenting the less time you spend with consumers' . . . I can only conclude that Doris will not be able to assume her caseload on schedule as compared with other VRCs who usually have entire caseload at 4 months.").

Second, rather than directly dispute the Defendants' basis for her firing, the Plaintiff claims that their "subjective evaluation" consists of "subjective criticisms of performance style." Plaintiff's Response ¶ 13, 10. She claims that unlike an attendance policy—which can be measured objectively—employers cannot prevail on a motion for summary judgment "based solely on its subjective evaluation of the employee's job performance." *Id.* ¶ 13. This however is a flatly inaccurate statement of the law. She does, however, attach the undersigned's opinion from *Aquart v. Ascension Health Info. Servs.*, discussed earlier. But *Aquart* supports the Defendants' position, as the basis for the firing in that case—a basis found to be legitimate and non-pretextual—was the failure of the plaintiff to perform well, or to "progress[ ] out of the learning phase" despite adequate time on the job to do so. 2011 WL 233587 at *9. These facts strongly resemble those here.

The fact is that an employer can fire an employee for a myriad of reasons—good or bad, wise or unwise, subjective or objective—so long as those reasons are not illegal. *See Gonzalez*, 176 F.3d at 836 (requiring a plaintiff to demonstrate that an adverse employment decision was made "solely because of his disability"). Once the employer offers a reason for a firing, provided it is not an illegal reason, then the employee must demonstrate that the proffered reason is actually a pretext for discrimination. *Aldrup v. Caldera*, 274 F.3d 282, 286 (5th Cir. 2001). The Plaintiff's view that only "objective" reasons suffice to place the burden back on the Plaintiff to show pretext is simply not the law. Here, the Plaintiff fails to rebut the Defendants' proffered legitimate reason for firing her and summary judgment on this claim is therefore proper.

3. **Failure to accommodate Plaintiff's disability**

Separate from her claim that she was terminated for her disability, the Plaintiff also claims that the Defendants failed properly to accommodate her disability during her probationary period.

11

If a qualified individual requests an accommodation, then the "employer and employee should engage in flexible, interactive discussions to determine the appropriate accommodation." *EEOC v. Agro Distrib., LLC*, 555 F.3d 462, 471 (5th Cir. 2009). Not all requested accommodations are appropriate, and the ADA only "provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Id.*

As discussed above, the Defendants accommodated all of the Plaintiff's requests until her final request, when the Defendants fired her before receiving the United Cerebral Palsy report recommending dictation software. The Plaintiff claims that by firing her before receiving the report, the Defendants failed to engage in an interactive process to provide a reasonable accommodation. However, this ignores the consistent efforts by the Defendants to supply the Plaintiff with the equipment she requested. In March, she thanked Duran for helping her acquire equipment. She did not request dictation software until May, five months after starting her job. It is clear from the evidence—none of which is disputed—that while the Defendants were aware of the Plaintiff's planned visit to the UCP assistive technology lab, they were not awaiting or even expecting a report from UCP about the dictation software. Resendes' developmental notes contain three negative events involving the Plaintiff between the time Resendes was notified that the Plaintiff had arranged to visit UCP and the date the Defendants fired the Plaintiff (June 4). Defendants' Exh. C2 at DARS-001921-22. The Plaintiff's probationary period was to end on June 12. In the context of these facts, the Defendants were not required to have any additional discussions regarding accommodations before making their decision to fire the Plaintiff.

Further, there is a disconnect in the Plaintiff's argument regarding the dictation software. The Defendants' persistent complaint with the Plaintiff was not that she was failing to take notes,

but rather that she made *too many* notes. The undisputed evidence is that one of the Plaintiff's performance problems was that she wrote too much. If she had received dictation software, it no doubt would have alleviated her pain when typing, but it would have done nothing to correct her underlying problem of writing too much. Indeed, the Plaintiff admits that if she had written more succinctly, she would have avoided some pain in her hands. Deposition of Ricks-Lankford at 101. In other words, the lack of dictation software did not cause the Plaintiff's poor job performance. The Defendants complied with each of the Plaintiff's accommodation requests as they received them; therefore, they did not violate the ADA by firing Plaintiff before they received the report recommending dictation software.

  **B.**  **The Plaintiff's claims under the ADEA**

  The ADEA makes it unlawful "for an employer . . . to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1) (2006). As with the Plaintiff's ADA claim, her ADEA claim is subjected to the same burden-shifting framework promulgated in *McDonnell Douglas Co. v. Green*, 411 U.S. 792 (1973). *See LaPierre v. Benson Nissan, Inc.*, 86 F.3d 444, 449 n.5 (5th Cir. 1996) (applying *McDonnell* to the ADEA).

  The Plaintiff claims that the Defendants violated the ADEA when it chose "younger, cuter" employees to represent DARS at community outreach events. Plaintiff's Response ¶ 34. Her allegation lacks sufficient facts to demonstrate that these younger employees were similarly situated. Further, she does not even contend, much less offer any evidence, that attendance at these events on

13

behalf of DARS was a privilege or benefit sufficient to make her being excluded from the events something that is it actionable under the ADEA. For both of these reasons, the ADEA claim fails.

C. **The Plaintiff's retaliation claims.**

The anti-retaliation provision of Title VII, 42 U.S.C. § 2000e-3(a), is broader than the discrimination provision of Title VII, but the Plaintiff must still "show that a reasonable employee would have found the challenged action materially adverse, which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations omitted).

A plaintiff establishes a prima facie case of retaliation by showing (1) she engaged in a protected activity, (2) an adverse employment action occurred, and (3) there was a causal link between the protected activity and the adverse employment action. *Taylor v. United Parcel Serv., Inc.*, 554 F.3d 510, 523 (5th Cir. 2008). The *McDonnell-Douglas* burden-shifting analysis applies to retaliation claims. Thus, if a plaintiff successfully presents a prima facie case or retaliation, the burden shifts to the employer to provide a "legitimate, non-retaliatory reason for the adverse employment action." *Long v. Eastfield Coll.*, 88 F.3d 300, 304–05 (5th Cir. 1996) (citation omitted). Upon answering this inquiry, the burden returns to the plaintiff to prove that the protected conduct "was a 'but for' cause of the adverse employment decision." *Id.* at 305 n.4 (citation omitted).

The Plaintiff fails to demonstrate a causal link between requesting accommodations and being fired. The sole evidence the Plaintiff offers in support is that the Defendants' "termination decision was made before the assessment report was received." Plaintiff's Response ¶ 33. The Plaintiff fails to explain why the Defendants fired her after this request when they previously accommodated each of her prior requests, and the Plaintiff asserts that the Defendants

14

accommodated her coworkers. *Id.* ¶ 21. Further, as noted above, the Plaintiff overstates the importance of the letter from UCP, and the inferences the Plaintiff suggests from the facts surrounding her visit to their assistive technology lab are illogical.

Even if the Plaintiff could establish causation, she cannot rebut the Defendants' legitimate, non-retaliatory reason for the adverse employment action. There is ample, indeed overwhelming, evidence, that the Defendants did not believe that the Plaintiff was performing up to standards. Her supervisor spent hours coaching her and attempting to get her to focus more on helping clients and less on making copious notes. The Plaintiff offers nothing to rebut these reasons. As with her discrimination claim, her claim under the anti-retaliation provision of Title VII fails.

**D.     Claims against Debra Wanser in her official capacity.**

Under the Supreme Court's decision in *Ex Parte Young*, 209 U.S. 123 (1908), a plaintiff may seek injunctive relief to stop a state official's ongoing violation of federal law. *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002) (internal quotation marks omitted). The Fifth Circuit has held that termination is not a continuing violation for limitations purposes in an employment discrimination case. *Taylor v. Bunge Corp.*, 775 F.2d 617, 619 (5th Cir. 1985) (per curiam). If the Plaintiff was requesting reinstatement, then she would have standing to bring a claim for prospective relief., *Nelson v. Univ. of Tex. at Dallas*, 535 F.3d 318, 324 (5th Cir. 2008), but she is not requesting reinstatement, so she lacks standing to make an *Ex Parte Young* claim for prospective injunctive relief. *Papasan v. Allain*, 478 U.S. 265, 278 (1986). And regardless of her lack of standing, because the underlying merits of her discrimination and retaliation claims are lacking, her *Ex Parte Young* claim fails for that reason as well.

## IV.     Recommendation

The Plaintiff failed to demonstrate that the Defendants terminated her because of her age, disability, or requests for accommodations. Rather, the Defendants stated that they fired her for her poor job performance, and the Plaintiff did not produce any evidence that this reason was not true or was a pretext for discrimination or retaliation. Because the Defendants fired her for a legitimate, non-discriminatory reason, the Plaintiff's claims fail. ACCORDINGLY, the Court HEREBY RECOMMENDS that the District Court GRANT the Defendants' Motion for Summary Judgment (Clerk's Doc. No. 51).

## V.     Warnings

The parties may file objections to this Report and Recommendation. A party filing objections must specifically identify those findings or recommendations to which objections are being made. The District Court need not consider frivolous, conclusive, or general objections. *See Battle v. United States Parole Comm'n*, 834 F.2d 419, 421 (5th Cir. 1987).

A party's failure to file written objections to the proposed findings and recommendations contained in this Report within fourteen (14) days after the party is served with a copy of the Report shall bar that party from *de novo* review by the District Court of the proposed findings and recommendations in the Report and, except upon grounds of plain error, shall bar the party from appellate review of unobjected-to proposed factual findings and legal conclusions accepted by the District Court. *See* 28 U.S.C. § 636(b)(1)(C); *Thomas v. Arn*, 474 U.S. 140, 150–53 (1985); *Douglass v. United Servs. Auto. Ass'n*, 79 F.3d 1415, 1428–29 (5th Cir. 1996) (en banc).

To the extent that a party has not been served by the Clerk with this Report & Recommendation electronically pursuant to the CM/ECF procedures of this District, the Clerk is

directed to mail such party a copy of this Report and Recommendation by certified mail, return receipt requested.

SIGNED this 24th day of October, 2011.

_____
ANDREW W. AUSTIN
UNITED STATES MAGISTRATE JUDGE